Jesse Colorado Swanhuyser (SBN 282186)
Email: jswanhuyser@alg.law
ANACAPA LAW GROUP, INC
508 East Haley Street
Santa Barbara, CA 93103
Tel: (805) 689-1469

Arthur Pugsley (SBN 252200)
Email: arthur@lawaterkeeper.org
Melissa Kelly (SBN 300817)
Email: melissa@lawaterkeeper.org
LOS ANGELES WATERKEEPER
120 Broadway, Suite 105
Santa Monica, CA 90401
Tel: (310) 394-6162
Fax: (310) 394-6178

Attorneys for Plaintiff
LOS ANGELES WATERKEEPER

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES WATERKEEPER, a non-profit corporation,<br><br>Plaintiff,<br><br>vs.<br><br>AAA PLATING & INSPECTION, INC., a California corporation, DOES 1 through 10,<br><br>Defendants. | Case No. _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

LOS ANGELES WATERKEEPER ("WATERKEEPER" or "Plaintiff"), a

California non-profit corporation, by and through its counsel, hereby alleges:

## I.      JURISDICTION AND VENUE

1.      This complaint seeks relief for ongoing violations by AAA PLATING &
INSPECTION, INC., a California corporation ("Defendant" or "AAA"), and DOES 1
through 10 of both substantive and procedural requirements of the Federal Water
Pollution Control Act, 33 U.S.C. § 1251, *et seq*. (the "Clean Water Act" or "Act") and
the National Pollutant Discharge Elimination System ("NPDES") Permit No. CA
S000001, State Water Resources Control Board ("State Board") Water Quality Order
No. 91-13-DWQ, as amended by Water Quality Order No. 92-12-DWQ, Water
Quality Order No. 97-03-DWQ ("1997 Permit") and Order No. 2014-0057-DWQ
("2015 Permit") (collectively referred to herein as the "Permit" or "General Permit"),
resulting from polluted stormwater and non-stormwater discharges from the industrial
facility owned and operated by AAA located between 410 and 424 East Dixon Street
("Facility") in Compton, California.

2.      This Court has subject matter jurisdiction over the parties and the subject
matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. §
1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United
States).  The relief requested is authorized pursuant to 28 U.S.C. §§ 2201–02 (power
to issue declaratory relief in case of actual controversy and further necessary relief
based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief and
civil penalties); and 33 U.S.C. §§ 1319(d); 1365(a) (civil penalties).

3.      On May 7, 2018, Plaintiff provided notice to AAA of violations at the

COMPLAINT

Facility of the Act and Permit, and of its intention to file suit against Defendant, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the California Regional Water Quality Control Board, Los Angeles Region ("Regional Board"); and to Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).  A true and correct copy of the notice letter is attached as EXHIBIT A, and is incorporated by reference.

4.      More than sixty (60) days have passed since notice was served on AAA and the State and Federal agencies.  Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

5.      Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## II.    INTRODUCTION

6.      This complaint seeks relief for unlawful discharges of polluted storm water and non-storm water from AAA's Facility in violation of the Act and Permit. Defendant's failures to comply with the discharge prohibitions, technology-based and water quality-based standards, planning and monitoring requirements, and other

COMPLAINT

procedural and substantive requirements of the Permit and the Act are ongoing and continuous.

7.      With every significant rainfall event millions of gallons of polluted storm water originating from industrial operations, like those conducted by Defendant, pour into storm drains and local waterways. The consensus among agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering surface waters each year.

8.      Los Angeles' waterways are ecologically sensitive areas and are essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. The waterways provide aesthetic opportunities, such as wildlife observation, and the public uses these waterways for activities such as water contact sports and non-contact recreation.

9.      Industrial facilities, like Defendant's, that discharge storm water and non-storm water contaminated with sediment, heavy metals, and other pollutants contribute to the impairment of downstream waters and aquatic dependent wildlife, expose people to such toxins, and harm the special aesthetic and recreational significance Los Angeles' waterways have for people in the surrounding communities.

## III.   THE PARTIES

10.    WATERKEEPER is a non-profit public benefit corporation organized under the laws of the State of California with its main office located at 120 Broadway,

Santa Monica, California 90401.  WATERKEEPER is an organization of the Waterkeeper Alliance, the world's fastest growing environmental movement.

11.     Founded in 1993, WATERKEEPER is dedicated to the preservation, protection and defense of the inland and coastal surface and groundwaters of Los Angeles County.  The organization works to achieve this goal through education, litigation and regulatory programs that ensure water quality protection for all waterways in Los Angeles County.  Where necessary to achieve its objectives, WATERKEEPER undertakes enforcement actions under the Act on behalf of itself and its members.

12.     LAW has approximately 3,000 members who live and/or recreate in and around the Los Angeles basin, including many who live and recreate along the Los Angeles River and connected waters.  WATERKEEPER members use and enjoy local waters and waterways to fish, surf, swim, sail, SCUBA dive, kayak, bird watch, view wildlife, hike, bike, walk, and run.  Additionally, WATERKEEPER members use the waters to engage in scientific study through pollution and habitat monitoring, and restoration activities.

13.     The unlawful discharge of pollutants from the Facility into the Los Angeles River and downstream water bodies impairs the ability of WATERKEEPER members to use and enjoy these waters.  Thus, the interests of WATERKEEPER and its members have been, are being, and will continue to be adversely affected by the Facility's failure to comply with the Act and Permit.  The relief sought herein will

redress the harms to Plaintiff caused by Defendant's activities. Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiff and its members, for which harm they have no plain, speedy or adequate remedy at law.

14.     AAA's website describes various industrial processes that occur at the Facility, including anodizing, cleaning, special processing, non-destructive testing, testing, painting/coating, and other.

15.     WATERKEEPER'S investigation indicates that the Facility provides a wide variety of plating, anodizing, testing, coating, painting and cleaning services. Industrial services offered by AAA at the Facility include, *inter alia*: nickel strike plating; cadmium plating; zinc plating; chromic acid anodizing; sulfuric anodizing; hard anodizing; boric-sulfuric anodizing; phosphoric anodizing; and ROHS and chem film anodizing; abrasive cleaning; titanium cleaning; bright dipping (copper); glass and plastic media blasting; passivation (Cres + Ti); etching/pickling (Al, Cres, and Ti); cadmium plating and coating; IVD aluminum coating; etch and adhesive bonding primers; epoxy and polyurethane topcoats; copper sulfate testing; and passivation.

16.     The Facility is among those industrial facilities subject to regulation by the South Coast Air Quality Management District ("Air District") under Proposed Amended Rule 1469 – Hexavalent Chromium Emissions from Chromium Electroplating and Chromic Acid Anodizing Operations ("PAR 1469"). PAR 1469 augments existing Air District requirements on plating and anodizing operations.

17.     Upon information and belief, Plaintiff alleges that the true names, or

capacities of DOES 1 through 10, inclusive (the "DOES"), whether individual, corporate, associate or otherwise, are presently unknown to WATERKEEPER, who therefore sue said Defendants by such fictitious names.  Plaintiff will amend this Complaint to show their true names and capacities when the same have been ascertained.  Plaintiff's initial investigations did not establish whether AAA is associated with any other individual, corporate, associate or otherwise.

## III.   LEGAL BACKGROUND

### A.   The Clean Water Act.

18.    Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the Act. Among other things, section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a NPDES permit issued pursuant to section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

19.    Section 402(p) of the Act establishes a framework regulating industrial storm water discharges under the NPDES permit program. 33 U.S.C. § 1342(p).

20.    The Act requires all point source discharges of pollutants to waters of the United States be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

21.    Section 402(b) of the Act allows each state to administer an EPA-approved NPDES permit program for regulating the discharge of pollutants, including

discharges of polluted storm water.  *See* 33 U.S.C. § 1342(b).

22.    States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial storm water discharges through the issuance of a statewide general NPDES permit applicable to all industrial dischargers and/or through individual NPDES permits issued to dischargers.  *See* 33 U.S.C. § 1342(b).

23.    The EPA promulgated regulations for the NPDES permit program that define waters of the United States. *See* 40 C.F.R. § 122.21.

24.    EPA interprets 'waters of the United States' to include traditionally navigable waters, waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters that could affect interstate commerce and have a significant nexus to a water of the United States. 40 C.F.R. § 122.21.

25.    A significant nexus is established if the receiving waters, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters. *Rapanos v. United States,* 547 U.S. 715 (2006). A significant nexus is established if waters that are tributary to navigable waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling.  *Id.* at 780.

26.    Section 505(a)(1) of the Act provides for citizen enforcement against any "person" who is alleged to be in violation of an "effluent standard or limitation…or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(1) and 1365(f).

27.     AAA is a "person" pursuant to the Act. *See* 33 U.S.C. § 1362(5).

28.     "Effluent standard or limitation" is defined to include: (a) the prohibition in section 301(a) against unpermitted discharges; or (b) a condition of an NPDES permit such as the General Permit. *See* 33 U.S.C. § 1365(f).

29.     Each separate violation of the Act subjects the violator to a penalty of up to $52,414 per day per violation for violations occurring after November 2, 2015; and up to $37,500 per day per violation for violations occurring prior to and including November 2, 2015.  *See* 33. U.S.C. §§ 1319(d) and 1365(a); 40 C.F.R. § 19.4 (Adjustment of Civil Monetary Penalties for Inflation).

30.     Section 505(d) of the Act allows prevailing or substantially prevailing parties to recover litigation costs, including fees for attorneys, experts, and consultants where it finds that such an award is appropriate.  *See* 33 U.S.C. § 1365(d).

**B.     California's Stormwater Permit.**

31.     California is authorized by EPA to issue NPDES permits.  In California, the relevant NPDES permit is the General Permit, which is issued by the State Board and implemented by the Regional Board for the region in question. *See* 33 U.S.C. § 1311(a), 1342, 1362(6), (7), (12).

32.     The State Board is charged with regulating pollutants to protect California's water resources.  *See* Cal. Water Code § 13001.

33.     In order to discharge storm water lawfully, industrial dischargers in California must comply with all terms of the General Permit, or obtain and comply

COMPLAINT

9

with an individual NPDES permit. 33 U.S.C. § 1311(a); *see also* 1997 Permit, Finding #2 *and* 2015 Permit, Section I(A) (Finding 12).

34.     Compliance with the Permit constitutes compliance with the Act for purposes of storm water discharges.  33. U.S.C. §§ 1311(b)(2)(A), 1311(b)(2)(E).  Conversely, "Permit noncompliance constitutes a violation of the Clean Water Act and [California's] Water Code."  1997 Permit, Section C(1); 2015 Permit, Section XXI(A).  The 2015 Permit superseded the 1997 Permit, except for enforcement purposes, and its terms are as stringent, or more so, than the terms of the 1997 Permit.  *See* 2015 Permit, Section I(A) (Finding 6).

35.     The Permit's annual compliance period runs from July 1 to June 30 ("Reporting Year").

36.     Compliance with the Permit requires that permittees consistently engage in a feedback loop strategy with four *independent, but mutual-reinforcing* actions: 1) executive planning and pollution control strategy design; 2) on-the-ground implementation of pollution control strategies; 3) monitoring stormwater discharges for evidence of pollution; and 4) annual evaluation of the effectiveness of pollution control strategies.

**C.     The Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations.**

37.     The Permit contains a Discharge Prohibition on direct and indirect discharges of materials other than storm water ("non-storm water discharges") that are

not otherwise authorized by an NPDES permit to waters of the United States. 1997 Permit, Section A(1); 2015 Permit, Section III(B).

38.     The Permit contains a Discharge Prohibition on storm water discharges and authorized non-storm water discharges that contain pollutants that cause or threaten to cause pollution, contamination, or nuisance as defined in section 13050 of California Water Code.  1997 Permit, Section A(2); 2015 Permit, Section III(C).

39.     The Permit contains a "technology-based" Effluent Limitation requiring permittee facilities to reduce or prevent pollutants in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  40 C.F.R. §§ 401.15-16; 1997 Permit, Section B(3); 2015 Permit, Section V(A).

40.     Compliance with this Effluent Limitation requires permittee facilities to implement effective, site-specific pollution control strategies called Best Management Practices ("BMPs") that are designed and implemented to prevent or reduce storm water discharges *consistent with* BAT and/or BCT treatment standards.

41.     BMPs achieving BAT/BCT-level control may include structural (e.g. installation of curbs to direct storm water flows, or filters to reduce pollutant concentrations), non-structural (e.g. sweeping/washing surfaces exposed to pollutants, or equipment inspections), or a combination of structural and non-structural measures.

42.     § 304(a)(4) of the Act identified "conventional pollutants" to include

11

Total Suspended Solids ("TSS"), Oil and Grease ("O&G) and pH.  *See* 40 C.F.R. 401.16. Permittees must design BMPs for all sources of TSS, O&G and pH that meet the BCT standard; and thereafter implement, maintain and revise/adapt such BMPs so as to ensure the concentration of TSS, O&G and pH in any storm water discharge is reduced or prevented consistent with the BCT standard.

43.    Multiple metals discharged from the Facility, including but not limited to copper, chromium, cadmium, zinc and nickel, are classified as toxic pollutants pursuant to the Act's section 307(a)(1) at 40 C.F.R. 401.15.

44.    Permittees must design BMPs for all sources of toxic pollutants; and thereafter implement, maintain and revise/adapt such BMPs so as to ensure pollutant concentrations in any storm water discharge is reduced or prevented consistent with the BAT standard.

45.    EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmark targets for pollutant concentrations in storm water discharges ("Benchmarks"). *See* United States Environmental Protection Agency NPDES Multi-Sector General Permit for Storm Water Discharges Associated with Industrial Activity, as modified effective May 9, 2009.

46.    Benchmarks serve as objective measures for evaluating whether the BMPs designed and implemented at a facility achieve the statutory BAT/BCT standards.  *See* MSGP, 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); *see also* MSGP, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); *see also* MSGP, 65 Fed. Reg. 64,746,

64,766-67 (Oct. 30, 2000).

47.     Discharges from an industrial facility containing pollutant concentrations that exceed Benchmark targets indicate that the facility needs to revise its BMPs to conform to BAT/BCT statutory requirements.  *Id*.  The persistent discharge of stormwater containing pollutant concentrations that exceed Benchmark targets provides *prima facie* evidence that a facility has failed to develop, implement and/or revise pollution control strategies consistent with BAT/BCT standards.

48.     The Permit contains certain Receiving Water Limitations intended to protect surface waters to which pollutants are discharged.  1997 Permit, Section C(1)-(2); 2015 Permit, Section VI(A).

49.     The Facility's Receiving Water include Compton Creek, the Los Angeles River, the Los Angeles River Estuary, the Los Angeles/Long Beach Harbor, San Pedro Bay, and the Pacific Ocean (hereinafter "Receiving Waters"), all of which are waters of the United States.  The Receiving Waters are an important community resource.  Although pollution and habitat destruction have drastically altered the natural ecosystem, the Receiving Waters serve essential social, environmental and economic functions.

50.     The first Receiving Water Limitation is that discharges shall not cause or contribute to an exceedance of any applicable water quality standard ("WQS").  *Id*.

51.     WQSs are numeric limits and narrative standards established by the State Board, the various regional boards, and the EPA to protect beneficial uses of the

COMPLAINT

13

Receiving Waters.

52.     WQS applicable to discharges from the Facility include, *inter alia*, those set out in the *Water Quality Control Plan – Los Angeles Region: Basin Plan for the Coastal Watersheds of Los Angeles and Ventura Counties*[1], California Regional Water Quality Control Board, Los Angeles Region 4 (adopted June 13, 1994, as amended) ("Basin Plan") and in the Criteria for Priority Toxic Pollutants for the State of California, a.k.a. California Toxics Rule ("CTR"). 65 Fed. Reg. 31712 (May 18, 2000); 40 C.F.R. § 131.38.

53.     Surface waters that cannot support designated beneficial uses (as listed in the Basin Plan) due to the occurrence of high levels of one or more pollutants are designated as impaired water bodies pursuant to Section 303(d). 33 U.S.C. § 1313(d).

54.     According to the 2012 303(d) List of Impaired Water Bodies, Compton Creek is impaired for copper, lead and toxicity.  Reach 2 of the Los Angeles River is impaired for, *inter alia*, copper, lead and oil.  Reach 1 of the Los Angeles River is impaired for, *inter alia*, aluminum, cadmium, copper, lead, nickel and zinc.  The Los Angeles River Estuary is impaired for, *inter alia*, chlordane, lead, sediment toxicity, and zinc.  The Los Angeles/Long Beach Inner Harbor is impaired for, *inter alia*, copper, sediment toxicity, and zinc.

55.     The Basin Plan includes narrative and numeric WQSs for inland surface

---

[1] *Available at* http://www.waterboards.ca.gov/losangeles/water_issues/programs/basin_plan/.

waters and enclosed bays and estuaries for, among other things: chemical constituents, toxic substances, pH, oil & grease, suspended or settleable matter, and floating materials.

56.     The existing and/or potential Beneficial Uses for downstream of the point at which the Los Angeles River receives storm water discharges from the Facility (i.e., Los Angeles River Reaches 1 and 2, the Los Angeles River Estuary, Los Angeles Harbor, and San Pedro Bay) include, among others, municipal and domestic supply; groundwater recharge; water contact recreation; non-contact water recreation; warm freshwater habitat; wildlife habitat; wetland habitat; marine habitat, estuarine habitat; rare, threatened, or endangered species; migration of aquatic organisms; spawning, reproduction, and/or early development; commercial and sport fishing, and shellfish harvesting. Basin Plan, Table 2-1.

57.     EPA promulgated the CTR based on a determination that the numeric criteria were necessary to protect human health and the environment.

58.     The CTR "criteria apply throughout the water body including at the point of discharge into the water body."  65 Fed. Reg. 31712 paragraph (c)(2)(i).

59.     The Permit's second Receiving Water Limitation is that storm water discharges shall not adversely impact human health or the environment. 1997 Permit, Section C(1); 2015 Permit, Section VI(B).

60.     The third Receiving Water Limitation is that concentrations of pollutants in storm water discharges shall not threaten to cause pollution or a public nuisance.

*See* 2015 Permit, Section VI(C).

61.     Thus, discharges with pollutant levels in excess of the Basin Plan standards, CTR criteria, and/or other applicable WQSs are violations of the Permit's Receiving Water Limitations.

62.     U.S. EPA has established Total Maximum Daily Load ("TMDL") regulations applicable to the Los Angeles River, which were subsequently incorporated into the Basin Plan via amendment by Resolution No. R13-004.

63.     The regulatory mechanism used to implement the TMDL wasteload allocations assigned to point sources, including the Facility, is the General Permit.

64.     Use of the Receiving Waters by WATERKEEPER members and public for water contact sports and fishing exposes many people to toxic metals, pathogens, bacteria and other contaminants in storm water and non-storm water discharges.  Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also harmed by polluted discharges to the Receiving Waters.

65.     Numeric WQS applicable to the Facility include, but may not be limited to, those detailed in TABLE 1.

/ /

/ /

/ /

/ /

COMPLAINT

16

TABLE 1
WATER QUALITY STANDARDS APPLICABLE TO THE FACILITY[2]

| PARAMETER | SOURCE | NUMERIC LIMIT |
|---|---|---|
| pH | Basin Plan | 6.5-8.5 s.u. |
| Al | Basin Plan | 1.0 mg/L |
| Cu | CTR | 0.013 mg/L (CMC) |
| Zn | CTR | 0.120 mg/L (CMC) |
| Pb | CTR | 0.065 mg/L (CMC) |
| Ni | CTR | 0.470 mg/L (CMC) |
| Cr | Basin Plan | 0.016 mg/L (CMC) |
| Arsenic | CTR | 0.34 mg/L (CMC) |

**D.    The Permit's Pollution Prevention Plan Requirements.**

66.    Permittees must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin. 1997 Permit, Sections A(1)(a), E(2); 2015 Permit, Sections I(I) (Finding 54), X(B).

67.    The SWPPP must include, *inter alia*: i) a narrative description and summary of all industrial activity, potential sources of pollution, and pollutants associated with each potential source; ii) a description of dust and particulate generating activities; iii) a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutant control measures; iv) a description of storm water management

---

[2] Several of the CTR limits are hardness dependent.  Defendant shall adjust the limit using the methods provided in Appendix J of the 2008 EPA Multi-Sector General Permit based on receiving water sampling hardness data as applicable.

COMPLAINT

17

practices; v) a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; vi) the identification and elimination of non-storm water discharges; vii) the identification and location where materials are being shipped, received, stored, handled, as well as typical quantities of such materials and the frequency with which they are handled; and viii) a description of persons and their current responsibility for developing and implementing the SWPPP. 1997 Permit, Sections A(1)-(10); 2015 Permit, Section X.

68.     The 2015 Permit requires certain SWPPP enhancements, including a more comprehensive assessment of potential pollutant sources, and more specific descriptions of BMPs to be implemented.  *See* 2015 Permit Sections X(G)(2), (4), (5).

69.     The objectives of the SWPPP are to: i) identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges; and ii) to identify and describe site-specific BMPs to reduce or prevent the discharge of polluted storm water from industrial facilities.  1997 Permit, Section A(2); 2015 Permit, Section X.

70.     The most important element of any SWPPP prepared pursuant to a *general* permit is the description of each industrial process occurring at the facility, the evaluation of sources of pollution associated with industrial activities, and the identification of pollutants that may affect the quality of stormwater ("Source Evaluation and Pollutant Assessment").  1997 Permit, Section A(2); 2015 Permit, Sections X(C), (F), (G).

71.     According to information available to WATERKEEPER, each of the industrial processes/services undertaken at the Facility and described in paragraphs 14 and 15 are pollutant sources that must be described and assessed for their potential contribution of pollutants in storm water discharges by AAA as part of the Facility's Source Evaluation and Pollutant Assessment.

72.     The SWPPP must describe, and permittees must then implement, site-specific BMPs tailored to the findings and conclusions of the Source Evaluation and Pollutant Assessment.  As described above, BMPs must meet BAT/BCT treatment standards, and prevent stormwater discharges with pollutant concentrations exceeding applicable WQSs. 1997 Permit, Section A(2); 2015 Permit, Sections I(D) (Finding 32), X(C), X(H), XXI(A).

73.     The SWPPP must be evaluated, and revised as necessary, *at least* annually to ensure ongoing compliance.  *See* 1997 Permit Sections A(9)-(10); *see also* 2015 Permit § X(B).

74.     Failures to develop, implement, or revise an adequate SWPPP constitutes Permit noncompliance. 1997 Permit, Section B(4)(c), 2015 Permit, Section X(B).

75.     The Permit requires permittees to complete an Annual Comprehensive Site Compliance Evaluation ("Compliance Evaluation").  The Compliance Evaluation must include: a review of all visual observation records, inspection reports and sampling analysis data; a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system; an evaluation

of each BMP to determine whether it is objectively adequate in light of M&RP data; an assessment of BMP design and implementation effectiveness; a determination regarding whether additional BMPs are needed to comply with the Permit; and a visual inspection of equipment needed to implement the SWPPP.  1997 Permit, Section A(9); 2015 Permit, Section XV.

76.    Section A(9)(d) of the 1997 Permit requires permittee's submit an annual Compliance Evaluation that includes an identification of personnel performing the evaluation, date(s) of the evaluation(s) necessary SWPPP revisions, a schedule for implementing SWPPP revisions, any incidents of non-compliance and the corrective actions taken, and a certification that the permittee is in compliance with the Permit. 1997 Permit; Section A(9)(d)(i)-(vi).  If certification cannot be provided, the permittee must explain in the Compliance Evaluation why the facility is not in compliance and/or report any anticipated noncompliance.  1997 Permit, Section A(9)(d); 2015 Permit, Section XXI(M).

**E.    The Permit's Monitoring and Reporting Requirements.**

77.    The 1997 Permit required permittees to develop a monitoring and reporting program ("M&RP") along with its SWPPP, and then implement the M&RP as soon as industrial activities began. 1997 Permit, Sections B(1)-(4), E(3).  The 2015 Permit contain virtually identical M&RP requirements.  2015 Permit, Sections X(I) and XI.

78.    The general objective of the M&RP is to assess Permit compliance.

Specifically, the M&RP must be designed and implemented to evaluate the effectiveness of BMP design and implementation.  Information derived from the M&RP informs each permittee as to whether it must adapt BMP design or implementation to ensure that storm water and non-storm water discharges are in compliance with the Permit (i.e. Discharge Prohibitions, Effluent Limitations, and/or Receiving Water Limitations).  *See* 1997 Permit, Section B(2); *see also* 2015 Permit, Sections X(I) and XI.

79.     The M&RP must include monthly visual observations of storm water discharges, and the documentation of the presence of pollutants.  1997 Permit, Section B(4)(a); 2015 Permit, Section XI(A).  Permittees are required to take corrective action to reduce or prevent pollutants from contacting storm water discharges as indicated by observations. 1997 Permit, Section B(4)(c); 2015 Permit, Section XI(A)(3).

80.     The Permit requires permittees to collect storm water samples from each location where storm water is discharged.  1997 Permit, Sections B(5), (7); 2015 Permit, Section XI(B)(4).  Section B(5)(a) of the 1997 Permit required permittees to collect storm water samples during the first hour of discharge from the first storm event of the Wet Season (defined as October 1 to March 30) and at least one other storm event in the Wet Season. All storm water discharge locations must be sampled. Facility operators that do not collect samples from the first storm event of the Wet Season are still required to collect samples from two other storm events of the Wet Season, and must explain in the Annual Report why the first storm event was not

sampled.

81.     Section XI(B)(2) of the 2015 Permit requires permittees to collect and analyze storm water samples from two (2) Qualifying Storm Events ("QSE") within the first half of each Reporting Year (July 1 to December 31), and two (2) QSEs within the second half of each Reporting Year (January 1 to June 30).  The 2015 Permit requires permittees to submit all sampling and analytical results for all samples via SMARTS within thirty (30) days of obtaining all results for each sampling event.

82.     Permittees must analyze each sample for as many as five classes of pollutants, including: 1) Basic Parameters, which are pH, TSS and either total organic carbon ("TOC") or O&G (1997 Permit, Section B(5)(c)(i); 2015 Permit, Sections XI(B)(6)(a)-(b)); 2) Facility-Specific Parameters, which are site-specific pollutants identified in the Source Evaluation and Pollutant Assessment (1997 Permit, Section B(5)(c)(ii); 2015 Permit, Section XI(B)(6)(c)); 3) Receiving Water Parameters, which are industrial pollutants related to receiving waters with 303(d) listed impairments, or an approved TMDL (1997 Permit, Section B(5)(c)(ii); 2015 Permit, Section XI(B)(6)(e)); 4) Standard Industrial Classification ("SIC") Code-Based Parameters, which are pollutants common to discharges from particular industrial activities listed in the Permit (*See e.g.* 2015 Permit, Section XI(b)(6)(d)); and 5) Board-Mandated Parameters, which are any additional pollutants identified by the relevant Regional Water Board (*See e.g.* 2015 Permit, Section XI(b)(6)(f)).

83.     Section B(14) of the 1997 Permit required that permittees submit an

Annual Report to the applicable Regional Board by July 1 of each year, which must include, *inter alia*, all records collected per the M&RP and the Compliance Evaluation.  The 2015 Permit contains substantially identical requirements.

84.     Section XVI of the 2015 Permit requires permittees to submit a Compliance Checklist with each Annual Report that: i) indicates whether the permittee complies with, and has addressed all applicable requirements of the 2015 Permit; ii) an explanation for any noncompliance of requirements within the reporting year, as indicated in the Compliance Checklist; and iii) an identification, including page numbers and/or sections, of all revisions made to the SWPPP within the reporting year, the date(s) of the annual Compliance Evaluation.  Most importantly, the Annual Report must outline BMP revisions or additions, if any, that are necessary for the permittee to comply with the Permit and Act.

**F.     2015 Permit Exceedance Response Actions Requirements.**

85.     The 2015 Permit formalized the "iterative process" directed by the 1997 Permit with procedures for Exceedance Response Actions ("ERA").  2015 Permit, Section XII. Permittees must complete ERA corrective actions when data from the M&RP demonstrates that BMPs are not sufficiently effective at limiting or preventing pollution in storm water discharges.

86.     Each permittee starts at Baseline in the first instance, and "if the sampled effluent exceeds the [Numeric Action Limit, or 'NAL'] for any parameter, the discharger is required to take an [ERA]" for any parameter(s) exceeding the NAL.  *Id*.

87.     The first time an NAL is exceeded for a parameter the facility is elevated from Baseline to Level 1 ERA status, and must work with a Qualified Industrial Stormwater Professional ("QISP") to evaluate and, if necessary, revise its BMPs and submit a report to the State. 2015 Permit, Section XII.C.

88.     Level 1 requirements include: 1) completing a pollutant source evaluation by October 1 following commencement of Level 1 status; and 2) filing a Level 1 ERA Report by the next January 1.  2015 Permit, Section XII.C.1-2.  The Level 1 ERA Report must include detailed descriptions of new and/or revised BMPs that the permittee proposes for bringing the facility into compliance with the Permit's Discharge Prohibitions, Effluent Limitations and Receiving Water Limitations.  *Id.*

89.     If the facility exceeds the NAL for the same parameter while it is in Level 1 status the facility is elevated to Level 2 status. 2015 Permit, Section XII(D). The facility must then prepare a Level 2 ERA Action Plan detailing how it will address persistent NAL exceedances. 2015 Permit, Section XII.D.1.

90.     NALs are not intended as technology-based or water quality-based numeric effluent limitations, and were not derived from either BAT or BCT requirements or receiving water objectives.

91.     A permittee "that does not fully comply with the Level 1 status and/or Level 2 status ERA requirements…is in violation of [the] General Permit." 2015 Permit, Section I(M) (Finding 63).

92.     The Permit's ERA structure requires permittees to identify those BMPs

necessary to achieve BAT and/or BCT treatment standards.

## V.  STATEMENT OF FACTS

93.   AAA's owns and operates the Facility, which has been enrolled in the Permit since April 2, 1992.

94.   According to multiple filings certified by AAA, the Facility's primary SIC Code is 3471 (Electroplating, Plating, Polishing, Anodizing, and Coloring). AAA has not identified any secondary or tertiary SIC codes.

95.   The Facility spans, at a minimum, 410 to 424 East Dixon Avenue.  The Facility is surrounded almost entirely by other industrial facilities, with the notable exception of 5 single-family homes that are immediately to the Facility's east.  There are no fewer than 4 schools near the Facility, including Dr. Ralph Bunche Middle School, which is located less than one block to the west.

96.   AAA's website indicates the Facility is 50,000 square feet.  The Notice of Intent to Comply with the Terms of the General Permit filed on February 3, 2015 indicates that the Facility is 43,500 square feet.

97.   The Facility is approximately 2.0 miles east of Compton Creek, and approximately 3.0 miles west of the Los Angeles River.

98.   According to AAA's SWPPP dated February 6, 2015, "the [F]acility has two definable discharge points on the north boundary of the facility along Dixon St. The remaining discharge of storm water is generally to the north as sheet flow."

99.   Information available to WATERKEEPER indicates that the Facility has

*at least* 3 discharge points, including the sheet flow onto Dixon noted in numerous

Annual Reports.  The Facility may have *as many as* 10 discharge points, including

roof downspouts along the driveway to the residences located west of the Facility.

100.   On information and belief, Plaintiff alleges that all industrial activities

performed at the Facility, including those described in paragraphs 14 and 15 above,

are potential sources of water contamination, and that the majority of storm water

discharges from the Facility contain storm water that is commingled with runoff from

areas at the Facility where industrial processes occur and where industrial pollutants

are found, including pollutants initially emitted into the air that settle on the ground

or other surfaces before being washed away in storm water.

101.   WATERKEEPER is informed and believes, and thereupon alleges that

storm water flowing over the Facility collects suspended sediment, dirt, metals, and

other pollutants, which are discharged to the Receiving Waters.

102.   On information and belief, Plaintiff alleges that the management

practices at the Facility do not prevent the sources of water contamination from

causing the discharge of pollutants to waters of the United States.

103.   AAA has taken and analyzed samples (or arranged for their

collection/analysis) of storm water discharges at the Facility since at least 1998.  AAA

has certified and submitted to the Regional Board at least some of these analytical

results, which are summarized in EXHIBIT B.  EXHIBIT B establishes that storm

water discharges from the Facility consistently contain pollutant concentration levels

COMPLAINT

that are above both Benchmark targets and various applicable WQS.

104.   Based on an assessment of the data summarized in EXHIBIT B, as well as its review of planning documents and reconnaissance visits conducted by staff and agents, WATERKEEPER alleges that AAA has and continues to violate the Permit and Act's public health and environmental protection mandates.

105.   Plaintiff alleges that the storm water sampling data summarized in EXHIBIT B, and specifically the data establishing pollutant concentrations exceeding Benchmark targets, demonstrates that AAA has failed to develop, implement or maintain BMPs at the Facility that meet BAT/BCT standards in violation of Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation I.D. and V.A. of the 2015 Permit.

106.   WATERKEEPER alleges that the data in EXHIBIT B, which contains evidence of consistent exceedances of the CTR numeric limits, establish that AAA has and likely continues to discharge storm water containing pollutant concentrations that adversely effect the environment and human health in violation of the Permit's Receiving Water Limitations.

107.   WATERKEEPER further alleges that the data in EXHIBIT B establish that AAA discharges storm water with pollutant concentrations that exceed applicable WQSs from the Basin Plan, and which evidences additional violations of the Permit's Receiving Water Limitations.

108.   On information and belief, and its review of the two SWPPP's available

via SMARTS—one revised on November 7, 2008 ("2008 SWPPP") and another revised on February 6, 2015 ("2015 SWPPP")—WATERKEEPER alleges that AAA has failed, and continues to fail, to prepare, implement, review and revise a legally adequate SWPPP, which constitutes an independent violation of the General Permit.

109.   On information and belief, WATERKEEPER alleges that the 2008 and 2015 SWPPPs do not contain a legally adequate Source Evaluation and Pollutant Assessment (*see e.g.* 2015 Permit §§ X(F), (G)), lack legally adequate BMPs and BMP descriptions (*see e.g.* 2015 Permit § X(H), do not contain a legally adequate M&RP (see e.g. 2015 Permit §§ X(I) and XI), and the Site Maps fail to include features required by the Permit.

110.   On information and belief, Plaintiff alleges that AAA has failed to effectively implement BMPs described in (or included by reference) its SWPPPs and other compliance documents, including but not limited to plans/reports developed as part of the ERA remedial procedures required by Section XII of the 2015 Permit.

111.   The inadequacy of the BMPs at the Facility is a result of the Defendant's failure to develop and implement an adequate SWPPP and M&RP for the Facility.

112.   On information and belief, Plaintiff alleges that AAA has failed to implement an adequate M&RP, most specifically a failure to collect a sufficient number of storm water samples, failure to collect samples from each discharge point, and failure to analyze collected samples for all pollutants required by the Permit.

113.   On information and belief, Plaintiff alleges that AAA failed to complete

required ERA in 2016, and that its subsequent efforts to comply with the ERA procedures are patently deficient.

114.    On information and belief, Plaintiff alleges that AAA has failed to complete a legally adequate Compliance Evaluation in any of the last 5 years.

115.    On information and belief, Plaintiff alleges that AAA has submitted Annual Reports over at least the last five years that contain numerous, material errors and omissions, including failures to describe legally adequate corrective actions and anticipated future non-compliance.

## VI.          CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Defendant's Discharges of Contaminated Storm Water in
Violation of the Permit's Effluent Limitations and the Act
(33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))**

116.    WATERKEEPER re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

117.    WATERKEEPER is informed and believes, and thereon alleges, that Defendant has failed and continues to fail to reduce or prevent pollutants associated with industrial activities through the implementation of BMPs at the Facility that achieve BAT/BCT treatment standards.

118.    WATERKEEPER is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT-level control from the Facility occur every time storm

water is discharged. Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the Permit and the Act. *See* 1997 Permit, Section B(3); *see also* 2015 Permit, Sections I(D) (Finding 32), V(A); *see also* 33 U.S.C. § 1311(b).

119.   Defendant violates and will continue to violate the Permit's Effluent Limitations each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Facility.

120.   Each and every violation of the Permit's Effluent limitations is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

121.   Defendants' violations of the Permit's Effluent Limitations and the Act are ongoing and continuous.

122.   By committing the acts and omissions alleged above, AAA is subject to an assessment of civil penalties for each and every violation of the Act occurring from May 7, 2013 to the present, pursuant to sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

123.   An action for injunctive relief is authorized by section 505(a) of the Act, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm WATERKEEPER has no plain, speedy, or adequate remedy at law.

124.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the

1   Parties.

2       WHEREFORE, Plaintiff prays for judgment against Defendant as set forth

3   hereafter.

4

5                    **SECOND CAUSE OF ACTION**

6       **Defendant's Discharges of Contaminated Storm Water in**
    **Violation of the Permit's Receiving Water Limitations and the Act**

7        **(33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))**

8       125.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if

9

10  fully set forth herein.

11      126.   WATERKEEPER is informed and believes, and thereon alleges, that

12
    discharges of storm water containing levels of pollutants that adversely impact human
13

14  health and/or the environment from the Facility occur each time storm water

15  discharges from the Facility.

16

17      127.   WATERKEEPER is informed and believes, and thereon alleges, that

18  storm water containing levels of pollutants that cause or contribute to exceedances of

19  water quality standards has been discharged and continues to be discharged from the

20

21  Facility each time stormwater is discharged from the Facility.

22      128.   Plaintiff is informed and believes, and thereupon alleges, that since at least

23
    May 7, 2013, Defendant has discharged polluted storm water from the Facility causing
24

25  or contributing to the violation of the applicable WQS. and adversely impacting human

26  health or the environment in violation of the Permit's Receiving Water Limitations.

27

28      129.   Every day, since at least May 7, 2013, that Defendant has discharged

COMPLAINT                                    31

polluted storm water from the Facility in violation of the Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

130.   Each and every violation of the Permit's Receiving Water Limitations is a separate and distinct violation of section 301(a) of the Act, 33 U.S.C. § 1311(a).

131.   By committing the acts and omissions alleged above, AAA is subject to an assessment of civil penalties for each and every violation of the Act occurring from May 7, 2013 to the present, pursuant to sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

132.   An action for injunctive relief is authorized by Act section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which WATERKEEPER has no plain, speedy, or adequate remedy at law.

133.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

### THIRD CAUSE OF ACTION
**Defendant's Failure to Prepare, Implement, Review, and Update
an Adequate Storm Water Pollution Prevention Plan
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

134.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if

fully set forth herein.

135.   Plaintiff is informed and believes, and thereupon alleges, that Defendant has not developed and implemented a legally adequate SWPPP for the Facility.

136.   Each day since May 7, 2013, that Defendant has not developed, implemented and updated a legally adequate SWPPP for the Facility is a separate and distinct violation of the Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

137.   Defendant has been in violation of the SWPPP requirements every day since May 7, 2013.  Violations continue each day that an adequate SWPPP for the Facility is not developed and fully implemented.

138.   By committing the acts and omissions alleged above, AAA is subject to an assessment of civil penalties for each and every violation of the Act occurring from May 7, 2013 to the present, pursuant to sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

139.   An action for injunctive relief is authorized by Act section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm WATERKEEPER has no plain, speedy, or adequate remedy at law.

140.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth

COMPLAINT
33

hereafter.

### FOURTH CAUSE OF ACTION
**Defendant's Failure to Develop and Implement an**
**Adequate Monitoring and Reporting Program**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

141.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

142.   Plaintiff is informed and believes, and thereupon alleges, Defendant has not developed and implemented a legally adequate monitoring and reporting program for the Facility.

143.   Each day since May 7, 2013, that Defendant has not developed and implemented an adequate monitoring and reporting program for the Facility in violation of the Permit is a separate and distinct violation of the Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  The absence of requisite collection/ monitoring and analytical results is ongoing and continuous.

144.   By committing the acts and omissions alleged above, AAA is subject to an assessment of civil penalties for each and every violation of the Act occurring from May 7, 2013 to the present, pursuant to sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

145.   An action for injunctive relief is authorized by Act section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which

COMPLAINT

harm WATERKEEPER has no plain, speedy, or adequate remedy at law.

146.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

### FIFTH CAUSE OF ACTION
**Defendant's Failure to Accurately Certify Compliance
in Annual Reports in Violation of the Permit and the Act
(33 U.S.C. §§ 1311, 1342, 1365(a) and 1365(f))**

147.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

148.   Defendant has not accurately certified compliance with the Permit in each of its annual reports submitted since at least April 13, 2013.

149.   Each day since at least May 7, 2013, that Defendant does not accurately certify compliance with the General Permit is a separate and distinct violation of the Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendant continues to be in violation of the General Permit's certification requirement each day it maintains an inaccurate certification of compliance with the General Permit.

150.   By committing the acts and omissions alleged above, AAA is subject to an assessment of civil penalties for each and every violation of the Act occurring from May 7, 2013 to the present, pursuant to sections 309(d) and 505 of the Act, 33 U.S.C.

COMPLAINT

35

§§ 1319(d), 1365, and 40 C.F.R. § 19.4.

151.   An action for injunctive relief is authorized by Act section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm WATERKEEPER has no plain, speedy, or adequate remedy at law.

152.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

## RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.   Declare Defendant to have violated, and to be in violation of, the Act as alleged herein;

b.   Enjoin Defendant from discharging polluted storm water from the Facility except as authorized by the Permit;

c.   Enjoin Defendant from further violating the substantive and procedural requirements of the Permit;

d.   Order Defendant to immediately implement storm water pollution control technologies and measures that are equivalent to BAT or BCT, and that prevent

COMPLAINT

pollutants in the Facility's storm water from contributing to violations of any water quality standards;

e.   Order Defendant to comply with the Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

f.   Order Defendant to prepare a SWPPP consistent with the Permit's requirements and implement procedures to regularly review and update the SWPPP;

g.   Order Defendant to provide Plaintiff with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Act and the Court's orders;

h.   Order Defendant to pay civil penalties of up to $37,500 per day per violation for each violation of the Act since April 13, 2013, up to and including November 2, 2015, and up to $52,414 for violations occurring after November 2, 2015 pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

i.   Order Defendant to take appropriate actions to restore the quality of waters impaired or adversely affected by their activities;

j.   Award Plaintiff's costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

k.   Award any such other and further relief deemed appropriate by the

1   Court.

2   DATED: July 6, 2018                Respectfully submitted,

3

4                                      By:    /s/ Jesse C. Swanhuyser

5                                             Jesse C. Swanhuyser
                                              **Attorney for Plaintiff**
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT                                        38

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COMPLAINT

1